Receipt Number

_39148_    EX A – M

82

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEHMAN BROTHERS BANK, FSB,
successor in interest to Capital Crossing Bank,

                Plaintiff,

vs.

THOMAS H. MALLORY, JR., KENNETH F.
DANTER, and WILLIAM E. HOLLAND, III,

                Defendants.

Case: 2:07-cv-11799
Assigned To: Battani, Marianne O
Referral Judge: Majzoub, Mona K
Filed: 04-24-2007 At 01:19 PM
CMP LEHMAN BROS BANK FSB V MALLORY,
JR., ET AL (LH)

---

## COMPLAINT

    Plaintiff, Lehman Brothers Bank, FSB, successor in interest to Capital Crossing Bank, ("Lehman Brothers Bank"), by its attorneys Foley & Lardner LLP, for its Complaint alleges as follows:

### PARTIES, JURISDICTION AND VENUE

    1.    Defendant Thomas H. Mallory, Jr. ("Mallory") is an individual and citizen of the State of Ohio.

    2.    Defendant Kenneth F. Danter ("Danter") is an individual and citizen of the State of Ohio.

    3.    Defendant William E. Holland, III ("Holland") is an individual and citizen of the State of Florida.

    4.    Lehman Brothers Bank is a subsidiary of Lehman Brothers Holdings, Inc., which is a State of Delaware Corporation, and Lehman Brothers Bank has its principle place of business in the State of Massachusetts. Thus, Lehman Brothers Bank is a citizen of the State of Delaware and the State of Massachusetts.

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds the sum or value of $75,000.00.

6.      This Court has personal jurisdiction over Mallory, Danter, and Holland (collectively the "Defendants") because they have transacted business within the State of Michigan and have an interest in real property situated within the State of Michigan.  MCL 600.705.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Also, the property which secures the subject indebtedness of this action is situated in this judicial district.

## GENERAL ALLEGATIONS

### *The 322 Loan*

8.      On or about July 20, 2004, Taylor Classic Living, LLC entered into a Development Loan Note, which was assigned loan number 5005120322 (the "322 Loan"), with Republic Bank.

9.      Under 322 Loan, Republic Bank agreed to loan Taylor Classic Living, LLC, the principal sum of $3,515,000.00.  A true and correct copy of the 322 Loan is attached as *Exhibit A*.

10.     Under the 322 Loan, Taylor Classic Living, LLC, agreed to make certain payments of principal and interest as set forth therein.

11.     The 322 Loan states that any "party liable for the debt evidenced by this Note, severally waives demand, presentment, notice of dishonor and protest of this Note".

2

12.    The 322 Loan states that "[t]his Note is delivered in the State of Michigan and governed by Michigan Law."

13.    The 322 Loan is secured by real property located in the City of Taylor, State of Michigan.

14.    The 322 Loan is signed by Mallory in his capacity as president of Taylor Classic Living, LLC.

15.    On or about November 15, 2006, the 322 Loan was modified allowing the issuance of a Letter of Credit for the account of Taylor Classic Living, LLC, and for the benefit of beneficiaries designated by Taylor Classic Living, LLC.

16.    Such Letter of Credit was drawn upon in the amount of $363,000.00 and became due and owing by Taylor Classic Living, LLC.

### *The 323 Loan*

17.    On or about July 20, 2004, Taylor Classic Living, LLC entered into a Master Construction Loan Note, which was assigned loan number 5005120323 (the "323 Loan"), with Republic Bank.

18.    Under 323 Loan, Republic Bank agreed to loan Taylor Classic Living, LLC, the principal sum of $5,150,000.00 under various sub-loans. A true and correct copy of the 323 Loan is attached as *Exhibit B*.

19.    Under the 323 Loan, Taylor Classic Living, LLC, agreed to make certain payments of principal and interest as set forth therein on certain sub-loans authorized under the 323 Loan.

20.    The 323 Loan states that any "party liable for the debt evidenced by this Note, severally waives demand, presentment, notice of dishonor and protest of this Note".

21.     The 323 Loan states that "[t]his Note is delivered in the State of Michigan and governed by Michigan Law."

22.     The 323 Loan is secured by real property located in the City of Taylor, State of Michigan.

23.     The 323 Loan is signed by Mallory in his capacity as president of Taylor Classic Living, LLC.

### The 414 Loan

24.     On or about July 29, 2005, Classic Traditions, LLC, entered into a Commercial Term Note, which was assigned loan number 5005120414 (the "414 Loan"), with Republic Bank.

25.     Under 414 Loan, Republic Bank agreed to loan Classic Traditions, LLC, the principal sum of $2,025,000.00. A true and correct copy of the 414 Loan is attached as *Exhibit C*.

26.     Under the 414 Loan, Classic Traditions, LLC, agreed to make certain payments of principal and interest as set forth therein.

27.     The 414 Loan states that any "[e]ach of the Borrower and every guarantor severally waives demand, presentment, notice of dishonor, protest, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices".

28.     The 414 Loan states that "[t]his Note has been executed in Michigan and is governed by Michigan Law."

29.     The 414 Loan is secured by real property located in Ypsilanti Township, State of Michigan.

4

30.    The 414 Loan is signed by Mallory in his capacity as president of Classic Traditions, LLC.

### *The 415 Loan*

31.    On or about July 29, 2005, Classic Properties Ypsilanti, LLC, entered into a Development Loan Note, which was assigned loan number 5005120415 (the "415 Loan"), with Republic Bank.

32.    Under 415 Loan, Republic Bank agreed to loan Classic Properties Ypsilanti, LLC, the principal sum of $3,575,000.00.  A true and correct copy of the 415 Loan is attached as *Exhibit D*.

33.    Under the 415 Loan, Classic Properties Ypsilanti, LLC, agreed to make certain payments of principal and interest as set forth therein.

34.    The 415 Loan states that any "party liable for the debt evidenced by this Note, severally waives demand, presentment, notice of dishonor and protest of this Note".

35.    The 415 Loan states that "[t]his Note is delivered in the State of Michigan and governed by Michigan Law."

36.    The 415 Loan is secured by real property located in Ypsilanti Township, State of Michigan.

37.    The 415 Loan is signed by Mallory in his capacity as president of Classic Traditions, LLC, the manager of Classic Properties Ypsilanti, LLC.

### *The Mallory Guaranties*

38.    By a Continuing Unlimited Guaranty agreement, dated as of July 15, 2004, Mallory guaranteed Taylor Classic Living, LLC's, indebtedness to Republic Bank, including its

5

indebtedness under the 322 and 323 Loans (the "2004 Mallory Guaranty"), a copy of which is attached as *Exhibit E.*

39.    The 2004 Mallory Guaranty states "[t]his Guaranty was executed in Michigan and is governed by Michigan law."

40.    By a Continuing Unlimited Guaranty agreement, dated as of July 29, 2005, Mallory guaranteed Classic Traditions LLC's, and Classic Properties Ypsilanti, LLC's, indebtedness to Republic Bank, including its indebtedness under the 414 and 415 Loans (the "2005 Mallory Guaranty"), a copy of which is attached as *Exhibit F.*

41.    The 2005 Mallory Guaranty states "[t]his Guaranty was executed in Michigan and is governed by Michigan law."

### *The Danter Guaranties*

42.    By a Continuing Unlimited Guaranty agreement, dated as of July 15, 2004, Danter guaranteed Taylor Classic Living, LLC's, indebtedness to Republic Bank, including its indebtedness under the 322 and 323 Loans (the "2004 Danter Guaranty"), a copy of which is attached as *Exhibit G.*

43.    The 2004 Danter Guaranty states "[t]his Guaranty was executed in Michigan and is governed by Michigan law."

44.    By a Continuing Unlimited Guaranty agreement, dated as of July 29, 2005, Danter guaranteed Classic Traditions LLC's, and Classic Properties Ypsilanti, LLC's, indebtedness to Republic Bank, including its indebtedness under the 414 and 415 Loans (the "2005 Danter Guaranty"), a copy of which is attached as *Exhibit H.*

45.    The 2005 Danter Guaranty states "[t]his Guaranty was executed in Michigan and is governed by Michigan law."

6

### *The Holland Guaranties*

46.    By a Continuing Unlimited Guaranty agreement, dated as of July 28, 2004, Holland guaranteed Taylor Classic Living, LLC's, indebtedness to Republic Bank, including its indebtedness under the 322 and 323 Loans (the "2004 Holland Guaranty"), a copy of which is attached as *Exhibit I*.

47.    The 2004 Holland Guaranty states "[t]his Guaranty was executed in Michigan and is governed by Michigan law."

48.    By a Continuing Unlimited Guaranty agreement, dated as of July 29, 2005, Holland guaranteed Classic Traditions LLC's, and Classic Properties Ypsilanti, LLC's, indebtedness to Republic Bank, including its indebtedness under the 414 and 415 Loans (the "2005 Holland Guaranty"), a copy of which is attached as *Exhibit J*.

49.    The 2005 Holland Guaranty states "[t]his Guaranty was executed in Michigan and is governed by Michigan law."

### *The Demand For Payment And Assignment*

50.    On December 20, 2006, by letter, Republic Bank sent Defendants Notices of Default regarding the 322, 323, 414, and 415 Loans, copies of which are attached as *Exhibit K*.

51.    On March 27, 2007, the mortgages securing the 322, 323, 414, and 415 Loans, along with all guaranties and all other documents evidencing the indebtedness were assigned by Republic Bank to Lehman Brothers Bank (the "Assignments"). True and correct copies of the Assignments are attached as *Exhibit L*.

### COUNT I – BREACH OF GUARANTIES

52.    Lehman Brothers Bank incorporates and realleges by reference the allegations set forth above as if restated in full.

7

53.    The 322, 323, 414, 415 Loans are hereinafter referred to collectively as the "Loans".

54.    The 2004 Mallory Guaranty, 2005 Mallory Guaranty, 2004 Danter Guaranty, 2005 Danter Guaranty, 2004 Holland Guaranty, and 2005 Holland Guaranty are hereinafter referred to collectively as the "Guaranties".

55.    In consideration of the Loans made by Republic Bank, and in order to induce Republic Bank to make the Loans, Defendants executed and delivered to Republic Bank the Guaranties.

56.    Pursuant to the terms of the Guaranties, Defendants, jointly and severally, guaranteed to Republic Bank, among other things, that they would unconditionally guarantee the full and prompt payment when due of all of the obligations of Taylor Classic Living, LLC, Classic Traditions, LLC, and Classic Properties Ypsilanti, LLC, due and owing to Republic Bank.

57.    The Guaranties are absolute and unconditional and remain in full force for as long as the debt remains unpaid.

58.    The Guaranties are also joint and several obligations, and are jointly and severally enforceable against each Defendant.

59.    Taylor Classic Living, LLC, Classic Traditions, LLC, and Classic Properties Ypsilanti, LLC, have not repaid the Loans.

60.    Defendants have not repaid the Loans.

61.    Because Taylor Classic Living, LLC, Classic Traditions, LLC, and Classic Properties Ypsilanti, LLC, are in default and it and Defendants have failed, refused, or neglected

8

to make payments required under the Loans and Guaranties, Republic Bank demanded full and immediate payment and performance of such obligations.

62.    As a result of the defaults as set forth above, and by virtue of the Assignments, as of April 23, 2007, the amount of principal, interest and late fees due and owing under the Loans is $7,448,931.13, plus accruing interest, fees and costs, with interest accruing at $2,078.77 per diem. A spreadsheet detailing the amount due and owing is attached as *Exhibit M*.

63.    Defendants are liable for immediate payment of the above amount, together with interest which has accrued and shall continue to accrue thereon, plus fees, costs, attorneys' fees and expenses incurred and to be incurred.

64.    All conditions precedent have been performed or have occurred.

65.    As a result of the foregoing, Defendants are now liable to Lehman Brothers Bank under the Guaranties.

WHEREFORE, Lehman Brothers Bank respectfully requests this Court to award it the following relief:

(a) to determine the amount due to Lehman Brothers Bank under the Guaranties and to enter judgment for such amount against Defendants, together with Lehman Brothers Bank's expenses, reasonable attorneys' fees, and other costs sustained in this action; and

(b) to grant to Lehman Brothers Bank such other relief as may be allowed under the law.

9

Dated:  April 24, 2007

Respectfully submitted,

FOLEY & LARDNER, LLP

Jeffrey S. Kopp (P59485)
Ryan S. Bewersdorf (P66411)
500 Woodward Ave., Suite 2700
Detroit, Michigan 48226
(313) 234-7100
jkopp@foley.com
rbewersdorf@foley.com
*Attorneys for Lehman Brothers Bank, FSB*

10



## DEVELOPMENT LOAN NOTE

US $3,515,000.00
Ann Arbor, Michigan
Loan Number:  5005120322

Date:  July 20, 2004
Due Date:  July 20, 2007

**Promise to Pay and Interest Rate.**  For Value Received, the undersigned, Taylor Classic Living, LLC, an Ohio limited liability company (the "Borrower"), promises to pay to the order of Republic Bank (the "Bank"), at the main Ann Arbor office of the Bank, the principal sum of Three Million Five Hundred Fifteen and 00/100 Dollars ($3,515,000.00), or such lesser amount as is indicated on the Bank's records, with interest computed on the balance from time to time unpaid on the basis of the actual number of days elapsed in a year of 360 days at the floating rate (the "Note Rate") that is two and 70/100 percentage points above the rate announced from time to time as the thirty day London Inter Bank Offering Rate (or LIBOR Rate) in the Wall Street Journal, which announced thirty day LIBOR Rate may not necessarily be the lowest rate charged by the Bank to any of its customers, and at a rate (3) three percentage points above the Note Rate on overdue principal from the date when due until paid.  Each change in the thirty day LIBOR RATE will immediately change the Note Rate.  In no event will the interest rate exceed the maximum rate allowed by law.  Any interest which would for any reason be unlawful under applicable law will be applied to principal.

**Interest Payments.**  Interest that accrues under this Note will be paid in consecutive monthly installments commencing August 20, 2004 and continuing on the 20th day of each consecutive month thereafter until July 20, 2007, at which time the entire balance of unpaid principal and interest is due and payable immediately.

**Principal Payments and Prepayments.**  The proceeds of this Development Loan Note are being used by the Borrower for the development of the following described real estate (the "Real Estate"): Parcel 1: The South 561 feet of the North 825 feet of the West 165 feet of the Northeast 1/4 of the Northeast 1/4 of Section 20, Town 3 South, Range 10 East, City of Taylor, Wayne County, Michigan, and Parcel 2: The East 1/2 of the Northwest 1/4 of the Northeast 1/4 of Section 20, except the North 60 feet thereof, Town 3 South, Range 10 East, City of Taylor, Wayne County, Michigan.  During the term of this Development Loan Note, the Borrower is also borrowing from the Bank under a construction loan for the construction of residential condominium units (in various buildings) on the Real Estate.  When the Borrower borrows under the construction loan for the start of a condominium unit, the outstanding principal balance of this Development Loan Note will be reduced by $59,575.00, and the same amount, $59,575.00, will be drawn down on a Sub-Loan under the construction loan. Regardless of the pace of construction and sale of condominium units, the entire balance of this Development Loan Note must be paid in full by the due date, July 20, 2007.  The Development Loan Note may be prepaid at any time, in whole or in part, without a prepayment premium.

**Late Charge.**  The Bank may charge a late charge equal to five percent (5%) of each installment which is received by the Bank more than ten (10) days after its due date.  Acceptance of the late charge does not waive any default under this Note.

**Miscellaneous.**  The Borrower and each endorser of this Note, and any other party liable for the debt evidenced by this Note, severally waives demand, presentment, notice of dishonor and protest of this Note; and consents to any extension or postponement of time of its payment without limit as to number or period; to any substitution, exchange or release of all or any part of the collateral securing this Note; to the addition of any party; and to the release, discharge, or suspension of any rights and remedies against any person who may be liable for the payment of the debt evidenced by this Note.  No delay on the part of the holder in the exercise of any right or remedy will operate as a waiver; no single or partial exercise by the holder of any right or remedy will preclude any other or further exercise of that right or remedy or the exercise of any other right or remedy; and no waiver or indulgence by the holder of any default is effective unless it is in writing and signed by the holder; nor will a waiver on one occasion be construed as a bar to, or waiver of, any right on any future occasion.

**Development Loan Agreement.**  This Note evidences a debt under the terms of a Development Loan Agreement between the Borrower and the Bank of even date, and any amendments to that agreement (collectively, the "Agreement"), the terms of which are incorporated into this Note by this reference, including events of default, remedies, notice, opportunity to cure, and acceleration provisions.  This is the Development Loan Note referred to in the Agreement.

**Successors and Michigan Law.**  This Note is binding on the Borrower and its successors, and inures to the benefit of the Bank, its successors and assigns.  Any reference to the Bank includes any holder of this Note.  This Note is delivered in the State of Michigan and governed by Michigan law.

**Waiver of Jury Trial.**  The Bank and the Borrower, after consulting or having had the opportunity to consult with counsel, knowingly, voluntarily and intentionally waive any right either of them may have to a trial by jury in any litigation based upon or arising out of this Note or any related instrument or agreement or any of the transactions contemplated by this Note or any course of conduct, dealing, statements, whether oral or written, or actions of either of them.  Neither the Bank nor the Borrower shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial has been waived with any other action in which a jury trial cannot be or has not been waived.  These provisions shall not be deemed to have been modified in any respect or relinquished by either the Bank or the Borrower except by a written instrument executed by both of them.

**Loan Fee.**  In connection with the Development Loan evidenced by this Development Loan Note, the Borrower has paid to the Bank a nonrefundable commitment fee in the amount of $17,575.

2

BORROWER:

TAYLOR CLASSIC LIVING, LLC,
an Ohio limited liability company


_____
Thomas H. Mallory, Jr. / President


Republic Bank
Development Loan Note
July 20, 2004


LANSING  21461-211  342166v02

3



## MASTER CONSTRUCTION LOAN NOTE

US $5,150,000.00
Ann Arbor, Michigan
Loan Number:  5005120323

Date:  July 20, 2004
Due Date:  July 20, 2007

Promise to Pay and Construction Loan Agreement.  For Value Received, the undersigned, Taylor Classic Living, LLC, an Ohio limited liability company (the "Borrower"), promises to pay to the order of Republic Bank (the "Bank"), at the main Ann Arbor office of the Bank, the principal sum of Five Million One Hundred Fifty Thousand and 00/100 Dollars ($5,150,000.00), or such lesser amount as is indicated on the Bank's records, with interest computed on the balance from time to time unpaid on the basis of the actual number of days elapsed in a year of 360 days at the applicable Sub-Loan interest rate, as set forth below.  This Note evidences a debt under the terms of a Construction Loan Agreement of even date between the Borrower and the Bank (the "Construction Loan Agreement").  The terms of the Construction Loan Agreement are incorporated into this Note by this reference, including events of default, remedies, notice, opportunity to cure, and acceleration provisions.  This is the Master Construction Loan Note referred to in the Construction Loan Agreement.  Capitalized terms that are used but not defined in this Note have the meanings set forth in the Construction Loan Agreement.

Construction Loan Sub-Loans.  Pursuant to the Construction Loan Agreement, the Borrower has agreed to borrow and the Bank has agreed to lend to the Borrower the principal sum of up to Five Million One Hundred Fifty Thousand and 00/100 Dollars ($5,150,000.00).  Each advance of Construction Loan proceeds for the construction of residential condominium units will be on a unit by unit basis and will be accompanied by the Bank's establishment of a Construction Loan Sub-Loan under this Master Construction Loan Note; provided, however, that the maximum principal sum of the Construction Loan that the Borrower may borrow is subject to the advance restrictions set forth in this Note and the Construction Loan Agreement.

Advances.  This is a revolving master Note under which the Bank may, if the conditions for advance under the Construction Loan Agreement are met to the Bank's satisfaction, advance sums from time to time and such sums may be prepaid by the undersigned from time to time; provided that the aggregate unpaid balance shall at no time exceed the face amount of this Note.  The principal amount payable under this Note (and under all Sub-Loans established under this Note) shall be the sum of all advances made by the Bank to or at the request of the Borrower, less principal payments actually received in cash by the Bank.  The books and records of the Bank shall be the best evidence of the Sub-Loans, the principal amount of each Sub-Loan, and the unpaid interest owing at any time under any Sub-Loan, and shall be conclusive absent manifest error.  If any payment applied by the Bank to this Note (or any Sub-Loan) is subsequently set aside, recovered, rescinded or otherwise required to be returned or disgorged by the Bank for any reason (pursuant to bankruptcy proceedings, fraudulent conveyance

statutes, or otherwise), this Note (and the applicable Sub-Loan) shall be deemed to have continued in existence, notwithstanding the application, and this Note (and the applicable Sub-Loan) shall be enforceable as to the amount of such payment as fully as if the Bank had not received and applied the payment.

Pre-Sold Units, Spec Units, and Model Units.  The interest rate and term to maturity of a Construction Loan Sub-Loan will depend on whether the Sub-Loan is for a Pre-Sold Unit or a Spec Unit.  A "Pre-Sold Unit" means a unit within the Construction Project that meets the following conditions: (a) there is a signed purchase agreement for the unit, (b) the purchasers of the unit have been pre-qualified for residential mortgage financing on the unit, and (c) the purchasers have deposited earnest money of at least 5% of the final purchase price in connection with their purchase agreement on the unit (including amendments and upgrades).  A "Spec Unit" means a unit within the Construction Project that is not a Pre-Sold Unit.  Spec Units include traditional spec units, the construction of which is begun without a committed purchaser.  Spec Units also include "Model Units" that are built as models for display to prospective purchasers of units within the Construction Project.  Not more that four Spec Units may be classified as Model Units at any one time.

Sub-Loan Advances on Units.  The Borrower may request advances under this Note until the earlier of (a) the date that is three (3) years after the date of this Note, or (b) the termination of the Bank's obligation to lend.  Provided that all conditions set forth in the Construction Loan Agreement are completed to the Bank's satisfaction, the Borrower is entitled to advances under this Note on a unit-by-unit basis, by way of the establishment of Construction Loan Sub-Loans; provided, however, that the Borrower is not entitled to the establishment of a Sub-Loan until five working days after the Bank has received a properly completed written request in a form prescribed by the Bank from time to time.  The following additional limitations apply to advances under this Note (by way of the establishment of Sub-Loans):

(a)    Advances on Pre-Sold Units.  A Sub-Loan applicable to a Pre-Sold Unit will provide that, subject to withholdings for reserves and the cost to complete the unit, advances may be taken for 90% of the cost of completed construction (in other words, there is a 10% Retainage), plus 100% of all other incurred costs, provided that advances may not exceed 80% of the purchase price of the Pre-Sold Unit.

(b)    Advances on Spec Units.  A Sub-Loan applicable to a Spec Unit will provide that, subject to withholdings for reserves and the cost to complete the unit, advances may be taken for 90% of the cost of completed construction (in other words, there is a 10% Retainage on Construction Costs), plus 100% of all other incurred costs, provided that advances may not exceed the lesser of (i) 80% of the cost to construct the Spec Unit (where the cost to construct the Spec Unit excludes the required $59,575 Development Loan principal repayment under the Sub-Loan associated with the Spec Unit), or (ii) 75% of the appraised value of the Spec Unit.

(c)    <u>Valuation of Spec Units</u>.  For purposes of advancing Construction Loan proceeds on a Spec Unit, the as-built appraised value of the Spec Unit will be based on a residential appraisal that is satisfactory to the Bank.

(d)    <u>Five Building Limit</u>.  No more than five (5) buildings containing Spec and/or Model units may be under construction at any one time.

(e)    <u>Maximum Number of Spec and Model Units</u>.  The Borrower may have no more than four (4) Model Sub-Loans outstanding at any one time, and no more than eight (8) Spec Sub-Loans outstanding at any one time, for a total of twelve (12) Model and Spec Sub-Loans outstanding at any one time.

(f)    <u>Development Loan Principal Repayment</u>.  $59,575 of each Construction Loan Sub-Loan must be advanced to repay principal under the Development Loan.

<u>Interest Rates, Maturities, and Payments on Sub-Loans</u>.  The Borrower may borrow, repay and re-borrow amounts under this Master Construction Loan Note from time to time, provided that: (i) the entire unpaid balance of this Note is due and payable thirty-six (36) months after the date of this Note; (ii) accrued interest on each Sub-Loan must be paid monthly; (iii) upon the sale of any unit, the payment required for the release of the Mortgage on the sold unit will be equal to the payoff balance of the Sub-Loan associated with that unit; and (iv) each Sub-Loan must be paid upon its maturity in a balloon payment of all unpaid principal and interest.  Principal outstanding under a Construction Loan Sub-Loan will bear interest on the principal balance outstanding from time to time, computed on the basis of the actual number of days elapsed in a year of 360 days.

(a)    <u>Note Rate and Maturity on Pre-Sold Sub-Loans</u>.  A Construction Loan Sub-Loan for a Pre-Sold Unit will bear interest at a floating Note Rate of interest equal to two and one-quarter (2.25) percentage points over the thirty day London Inter Bank Offering Rate (LIBOR Rate) as reported in <u>The Wall Street Journal</u> from time to time.  The reported LIBOR Rate may not necessarily be the lowest rate at which the Bank loans money to any of its borrowers.  Each change in the 30 day LIBOR Rate will automatically change the Note Rate on the Construction Loan Sub-Loan.  The term to maturity of a Construction Loan Sub-Loan for a Pre-Sold Unit will be nine (9) months.

(b)    <u>Note Rate and Maturity on Spec and Model Sub-Loans</u>.  A Construction Loan Sub-Loan for a Spec or Model Unit will bear interest at the floating Note Rate of interest equal to two and one-half (2.5) percentage points over the thirty day LIBOR Rate as reported in <u>The Wall Street Journal</u> from time to time.  The reported LIBOR Rate may not necessarily be the lowest rate at which the Bank loans money to any of its borrowers.  Each change in the

3

30 day LIBOR Rate will automatically change the Note Rate on the Construction Loan Sub-Loan. The term to maturity of a Construction Loan Sub-Loan for a Spec Unit (that is not a Model Unit) will be twelve (12) months. The term to maturity of a Construction Loan Sub-Loan for a Model Unit will be thirty-six (36) months. If a non-Model Spec Unit is financed with a 12 month Construction Loan Sub-Loan, but the unit is later converted to a Model (say, for example, because a Model unit is sold to a customer), the maturity of the 12 month Construction Loan Sub-Loan will be increased by the Bank from 12 months to 36 months (measured from the original date of the Sub-Loan).

(c)     Default Rate of Interest. Upon maturity of this Master Construction Loan Note and/or upon maturity of any Sub-Loan established under this Master Construction Loan Note, whether maturity results from acceleration or otherwise, all overdue principal will accrue interest at a default rate of interest equal to three (3) percentage points over the applicable Note Rate.

(d)     Takedown Schedule. Starting in the ninth month (the third quarter) after the date of this Note, the Borrower is required to make principal reductions equivalent to the sale of at least 8 units per quarter.

Interest Reserve on Sub-Loans. The Borrower agrees to use the proceeds of the Construction Loan solely for (i) the repayment of the Development Loan, (ii) the construction of the condominium units in accordance with Plans and Specifications approved by the Borrower and the Bank, (iii) an interest reserve, and (iv) other Indirect Costs in connection with the Construction Loan. The Bank will reserve $1,591 of the proceeds of each Construction Loan Sub-Loan as a reserve for the payment of interest on that Sub-Loan. The Bank is authorized to advance from the interest reserve as interest becomes due under the Construction Loan Sub-Loan.

Commitment Fee and Sub-Loan Fee. The Borrower and the Bank acknowledge that the Borrower has paid the Bank a Construction Loan commitment fee of $15,000 and that this fee is nonrefundable. Upon the establishment of each Construction Loan Sub-Loan, the Borrower must pay to the Bank a $125 Sub-Loan Fee.

Late Charge. The Bank may charge a late charge equal to five percent (5%) of each Sub-Loan payment which is received by the Bank more than ten (10) days after its due date. Acceptance of the late charge does not waive any default under this Note.

Miscellaneous. The Borrower and each endorser of this Note, and any other party liable for the debt evidenced by this Note, severally waives demand, presentment, notice of dishonor and protest of this Note; and consents to any extension or postponement of time of its payment without limit as to number or period; to any substitution, exchange or release of all or any part of the collateral securing this Note; to the addition of any party; and to the release, discharge, or suspension of any rights and remedies against any person who may be liable for the payment of the debt evidenced by this Note. No delay

on the part of the holder in the exercise of any right or remedy will operate as a waiver; no single or partial exercise by the holder of any right or remedy will preclude any other or further exercise of that right or remedy or the exercise of any other right or remedy; and no waiver or indulgence by the holder of any default is effective unless it is in writing and signed by the holder; nor will a waiver on one occasion be construed as a bar to, or waiver of, any right on any future occasion.

Successors and Michigan Law. This Note is binding on the Borrower and its successors, and inures to the benefit of the Bank, its successors and assigns. Any reference to the Bank includes any holder of this Note. This Note is delivered in the State of Michigan and governed by Michigan law.

Waiver of Jury Trial. The Bank and the Borrower, after consulting or having had the opportunity to consult with counsel, knowingly, voluntarily and intentionally waive any right either of them may have to a trial by jury in any litigation based upon or arising out of this Note or any related instrument or agreement or any of the transactions contemplated by this Note or any course of conduct, dealing, statements, whether oral or written, or actions of either of them. Neither the Bank nor the Borrower shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial has been waived with any other action in which a jury trial cannot be or has not been waived. These provisions shall not be deemed to have been modified in any respect or relinquished by either the Bank or the Borrower except by a written instrument executed by both of them.

BORROWER:

TAYLOR CLASSIC LIVING, LLC,
an Ohio limited liability company

Thomas H. Mallory, Jr., President

LANSING 21461-211 342368v02

5



## COMMERCIAL TERM NOTE

Date: July 29, 2005 ✓

Amount: $2,025,000.00 ✓

Due Date: July 29, 2007 ✓

Loan No.: 5005120414 ✓

Promise to Pay. Classic Traditions, LLC, an Ohio limited liability company (the "Borrower") promises to pay to the order of Republic Bank (the "Bank"), at any office of the Bank in the State of Michigan, the sum of Two Million Twenty-Five Thousand and 00/100 U.S. Dollars ($2,025,000.00) and to pay interest on the unpaid balance at the ✓ Note Rate (as defined below) until either an Event of Default (as defined below) occurs or this Note becomes due, whether by default, demand or maturity, and thereafter at a rate equal to the Note Rate plus two (2) percentage points. In no event will the interest rate exceed the maximum rate allowed by law.

Interest Rate (LIBOR). The "Note Rate" means six and forty-three one hundredths percent (6.43%) per year until the first Adjustment Date, and on the first and ✓ each subsequent Adjustment Date, the Note Rate will be adjusted to equal the Index in effect for such Adjustment Date plus three (3) percentage points. For any Adjustment ✓ Date, the "Index" means the London Inter Bank Offered Rate (One Month) as reported by any source chosen by the Bank on such date. "Adjustment Date" means the first business day in each month following the date of this Note. In the event the London Inter Bank Offered Rate (One Month) ceases to be reported and is otherwise not readily determinable, the Index will mean a published rate chosen by the Bank comparable to the London Inter Bank Offered Rate (One Month). Interest will be calculated for the actual number of days the principal is outstanding on the basis of a 360 day year.

Prepayment Premium. The Borrower may at any time prepay this Note, in whole ✓ or in part, without the payment of a prepayment premium.

Payments. This Note is payable in twenty-four consecutive monthly payments beginning August 29, 2005 and continuing on the same day (the last day of February) of each consecutive month thereafter. The amount of each installment, except the final installment, is accrued interest to payment due date. The final installment is equal to the entire unpaid balance of principal and accrued interest. All payments hereunder shall be in immediately available United States funds, without setoff or counterclaim. If this Note or any installment of this Note is payable on a day other than a day on which the Bank is open for business, such payment will be extended to the next succeeding business day and interest thereon will be payable at the rate herein specified during the extension. If any payment applied by the Bank to this Note is subsequently set aside, recovered, rescinded or otherwise required to be returned or disgorged by the Bank for any reason (pursuant to bankruptcy proceedings, fraudulent conveyance statutes, or otherwise), this Note shall be deemed to have continued in existence, notwithstanding the application, and this Note shall be enforceable as to the amount of such payment as fully as if the Bank had not received and applied the payment.

<u>Late Charge</u>. The Bank may charge a late charge equal to five percent (5%) of each installment which is received by the Bank more than ten (10) days after due. Acceptance of the late charge shall not waive any default under this Note.

✓ <u>Phase II Land and Commercial Land</u>. In this Note, the "Phase II Land" means real estate owned by the Borrower in the vicinity of Ellsworth Road, Hewitt Road, West Michigan Avenue (U.S. 12), and I-94, Ypsilanti Township, Washtenaw County, Michigan. Similarly, the "Commercial Land" means real estate owned by the Borrower in the vicinity of Ellsworth Road, Hewitt Road, West Michigan Avenue (U.S. 12), and I-94, Ypsilanti Township, Washtenaw County, Michigan.

<u>Security</u>. This Note and any other indebtedness and liabilities of the Borrower and/or any guarantor to the Bank, and all renewals or extensions thereof, whether joint or several, contingent or absolute, now existing or hereafter arising, and howsoever evidenced (herein collectively called the "<u>Liabilities</u>") are secured by all items now or hereafter deposited in any account of the Borrower and/or any guarantor with the Bank and by all proceeds of such items (cash or otherwise), by all account balances of the Borrower and/or any guarantor now or hereafter with the Bank, by all property of the Borrower and/or any guarantor now or hereafter in the possession of the Bank, and by any other collateral, rights and properties described in each and every mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will hereafter be, executed by the Borrower and/or any guarantor to or for the benefit of the Bank (all herein collectively called the "<u>Collateral</u>"). The Collateral includes (a) a first priority mortgage as to the Phase II Land and the Commercial Land, (b) an assignment of leases and rents as to the Phase II Land and the Commercial Land (which assignment of leases and rents is set forth in the mortgage document), and (c) continuing unlimited payment guarantees from each of Kenneth F. Danter, Thomas H. Mallory, Jr., and William E. Holland III.

<u>Representations</u>. The Borrower represents: (a) that the execution and delivery of this Note and the performance of the obligations it imposes do not violate any law, conflict with any agreement by which it is bound, or require the consent or approval of any governmental authority or any third party; (b) that this Note is a valid and binding agreement, enforceable according to its terms; and (c) that all balance sheets, profit and loss statements, and other financial statements furnished to the Bank are accurate and fairly reflect the financial condition of the organizations and persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not changed materially and adversely since those dates. The Borrower further represents: (a) that it is duly organized, existing and in good standing pursuant to the laws under which it is organized; and (b) that the execution and delivery of this Note and the performance of the obligations it imposes (i) are within its powers and have been duly authorized by all necessary action of its governing body; and (ii) do not contravene the terms of its articles of incorporation or organization, or its bylaws, partnership, operating or other agreement governing its affairs.

2

Default. Occurrence of any of the following events is an "Event of Default" under this Note: (a) non-payment when due, of this Note or any other Liabilities, or any obligations of any guarantor to the Bank ("Payment Default"); (b) failure of the Borrower or any guarantor to comply with any term of any agreement between any of them and the Bank; (c) the Bank discovers that any warranty or representation made to it by the Borrower or any guarantor was or is false; (d) the Borrower or any guarantor becomes insolvent or unable to pay debts as they mature or makes an assignment for the benefit of creditors or any judgment is entered or any writ of attachment, garnishment or execution or tax lien is issued or levied against any one of them, any of their property or the Collateral; (e) any proceeding is instituted by or against the Borrower or any Guarantor under any bankruptcy, insolvency, or similar laws ("Bankruptcy Default"); (e) any indebtedness of the Borrower or any guarantor becomes due by reason of default and/or acceleration of the maturity thereof; (f) death or incompetency of the Borrower or any guarantor, if a natural person; dissolution or death of a partner of the Borrower or any guarantor, if a partnership; dissolution, merger, consolidation or a material change in the ownership of the voting stock of the Borrower or any guarantor, if a corporation; dissolution, merger, or change in the members of the Borrower, if a limited liability company; (g) cessation of the normal business operations of the Borrower or any guarantor; (h) actual, impending, or reasonably anticipated decline in the value of the Collateral or the Bank deems the margin of the Collateral securing the Liabilities to be insufficient; (i) sale of any assets of the Borrower, other than sales of inventory in the ordinary course of business; (j) if the control or management of the Borrower or any guarantor changes in a manner which adversely affects, in the sole judgment of the Bank, the ability of the Borrower or any guarantor to carry on its business as previously conducted; (k) failure of the Borrower or any guarantor to pay, when due, any federal, state, or local tax, assessment, withheld tax, or similar obligation; (l) any guaranty of, document granting security for, or subordination agreement regarding, any of the Liabilities shall, at any time, cease to be in full force and effect or be declared null and void, or any party to such guaranty, security document or subordination agreement (other than the Bank) gives notice of termination thereunder or denies that it has any future or further liability thereunder (by giving notice to such effect or otherwise) or contests the validity or enforceability thereof; (m) the Bank deems itself insecure, in good faith, believing that the prospect of payment of this Note or any of the Liabilities is impaired or in good faith fearing deterioration, removal or waste of any of the Collateral; or (n) the Borrower or any guarantor becomes subject at any time to any law, regulation or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits the Bank from making an advance or extension of credit to the Borrower or any guarantor or from otherwise conducting business with the Borrower or any guarantor or fails to provide documentary and other evidence of the Borrower's or any guarantor's identity as may be requested by the Bank at any time to enable the Bank to verify the Borrower's or any guarantor's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

Remedies on Default. Upon occurrence of an Event of Default and after the giving of any required notice of default and opportunity to cure: (a) this Note and all of

3

the other Liabilities (regardless of any contrary terms of such Liabilities) shall, at the Bank's option, be immediately due and payable without further demand or further notice; (b) the Bank may exercise any right and remedies granted to it by this Note, any of the Liabilities or any present or future agreement with any of the Borrower or any guarantor, or otherwise available to the Bank under applicable law; (c) the Bank may exercise its right of set-off and/or take possession of and dispose of any of the Collateral. The Borrower and all guarantors agree to reimburse the holder or owner of this Note upon demand for any and all reasonable costs and reasonable expenses (including without limit, court costs, legal expenses and reasonable attorney fees, whether inside or outside counsel is used, whether or not suit is instituted and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in collecting or attempting to collect this Note or incurred in any other matter or proceeding relating to this Note (including participating or taking action in any bankruptcy or other insolvency proceeding of the Borrower or any guarantor).

Notice of Default and Opportunity to Cure. In the event of a Bankruptcy Default, a notice of default is not required, opportunity to cure is not required, and, at the Bank's option, acceleration of the Liabilities is immediate and automatic. In the event of a Payment Default, the Bank will give to the Borrower a written notice of default, and an opportunity of at least ten (10) days to cure the Payment Default. In the event of any other default (other than a Bankruptcy Default or a Payment Default), the Bank will give to the Borrower a written notice of default, and an opportunity of at least thirty (30) days to cure the default.

Waivers. Each of the Borrower and every guarantor severally waives demand, presentment, notice of dishonor, protest, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and consents to: (a) any extension or postponement of the time for payment of this Note; (b) any renewal of this Note or indulgences granted by the Bank with respect to enforcement of its terms; (c) any substitution, exchange or release of all or any part of the Collateral; (d) the addition, substitution or release of any maker or guarantor; and (e) the election by the Bank not to seek enforcement against any person or entity which may be liable for payment of this Note. The Borrower waives all defenses or right to discharge available under Section 3-605 of the Michigan Uniform Commercial Code and waives all other suretyship defenses or right to discharge.

Information Sharing. The Bank may provide, without any limitation whatsoever, any information or knowledge the Bank may have about the Borrower or any matter relating to this Note and any related documents to the Bank's parent, subsidiaries and affiliates and their successors, or to any one or more purchasers or potential purchasers of this Note or any related documents, and the Borrower waives any right to privacy the Borrower may have with respect to such matters. The Borrower agree that the Bank may at any time sell, assign or transfer one or more interests or participations in all or any part of its rights or obligations under this Note to one or more purchasers whether or not related to the Bank.

Miscellaneous. The term "guarantor" or "Guarantor" as used herein means any person or entity endorsing or guaranteeing, or granting security for this Note in any manner. The obligations of the Borrower and all guarantors under this Note are joint and several; and the Borrower and each guarantor is individually liable for all amounts due under this Note. All persons signing this Note on behalf of a corporation, partnership, trust or other entity warrants to the Bank that they are duly and properly authorized to execute this Note and that the proceeds will be used by the entity for business purposes. Nothing in this Note shall waive or restrict any right of the Bank granted in any other document or by law. No delay on the part of the Bank in the exercise of any right or remedy shall operate as a waiver. No single or partial exercise by the Bank of any right or remedy shall preclude any other future exercise of that right or remedy or the exercise of any other right or remedy. The terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver, or modification of the terms of this Note. A waiver on one occasion shall not be construed as a waiver of that term on any future occasion. Acceptance of partial or late payments owing on this Note at any time shall not be deemed a waiver of any default. All rights, remedies and security granted to the Bank herein are cumulative and in addition to other rights, remedies or security which may be granted elsewhere or by law. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law. If any provision hereof shall be declared invalid or illegal it shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this Note. Any reference to the Bank shall include any holder of this Note and any holder shall succeed to the Bank's rights. This Note shall bind the respective heirs, personal representatives, successors and assigns of the Borrower and all guarantors. The Borrower and all guarantors agree that any action against them for enforcement of this Note may be brought by the Bank in any federal, municipal or state court in Michigan, having jurisdiction of the subject matter; they consent to personal jurisdiction over them by such courts; and they consent to venue in such courts. This Note has been executed in Michigan and is governed by Michigan law. The Borrower and all guarantors agree to reimburse the Bank for all expenses incurred by the Bank in its investigation, processing, and preparation for closing of the loan evidenced by this Note including reasonable attorneys' fees and costs, title insurance fees, survey fees, appraisal fees, and other out-of-pocket expenses.

WAIVER OF SPECIAL DAMAGES. THE BORROWER WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT THE BORROWER MAY HAVE TO CLAIM OR RECOVER FROM THE BANK IN ANY LEGAL ACTION OR PROCEEDING ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

WAIVER OF JURY TRIAL. THE BORROWER AND THE BANK HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE

(WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) BETWEEN THE
BORROWER AND THE BANK ARISING OUT OF OR IN ANY WAY RELATED TO
THIS NOTE, ANY OF THE LIABILITIES, OR ANY ALLEGED ACT OR NEGLECT OF
THE BANK. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE BANK TO
PROVIDE THE FINANCING DESCRIBED HEREIN.

Servicing Requirements. As long as any Liabilities are owed by the Borrower to
the Bank: (a) Annually, on or before a date specified by the Bank, the Borrower (or the
Guarantor, Kenneth F. Danter) will provide (on a form specified by Republic Bank) the
then current personal signed financial statement of Kenneth F. Danter, together with
and supported by a true and accurate copy of the then current signed federal tax return
of Kenneth F. Danter (with all attachments and schedules). (b) Annually, on or before a
date specified by the Bank, the Borrower (or the Guarantor, Thomas H. Mallory, Jr.) will
provide (on a form specified by Republic Bank) the then current personal signed
financial statement of Thomas H. Mallory, Jr., together with and supported by a true and
accurate copy of the then current signed federal tax return of Thomas H. Mallory, Jr.
(with all attachments and schedules). (c) Annually, on or before a date specified by the
Bank, the Borrower (or the Guarantor, William E. Holland III) will provide (on a form
specified by Republic Bank) the then current personal signed financial statement of
William E. Holland III, together with and supported by a true and accurate copy of the
then current signed federal tax return of William E. Holland III (with all attachments and
schedules). (d) Annually, within ten (10) days after its filing date, the Borrower will
provide a true and accurate copy of the Borrower's signed federal tax return, with all
attachments and schedules. (e) From time to time, the Borrower will provide other
financial information requested by the Bank and pertaining to the Borrower, the
Guarantors, the Phase II Land, and/or the Commercial Land.

Deposits. As long as any Liabilities are owed by the Borrower to the Bank, the
Borrower must maintain a deposit account with the Bank.

Interest Reserve. Two Hundred Thousand Dollars ($200,000) of the proceeds of
this Note must be used to fund an interest reserve for the payment of interest under this
Note.

Loan Fees. In connection with the Term Loan evidenced by this Commercial
Term Note, the Borrower has paid to the Bank a nonrefundable commitment fee in the
amount of $15,188 and a nonrefundable documentation fee in the amount of $500.

[signature is on the following page]

6

Borrower's Address:                          Borrower:

363 East Town Street                          Classic Traditions, LLC,
Columbus, Ohio 43215                       an Ohio limited liability company

_____
Thomas H. Mallory, Jr., President

Republic Bank
Classic Traditions, LLC
$2,025,000 Commercial Term Note
July 29, 2005

LANSING  21461-251  361257v2

7



## DEVELOPMENT LOAN NOTE

US $3,575,000.00                                              Date: July 29, 2005
Loan Number: 5005120415                          Due Date: July 29, 2008

**Promise to Pay and Interest Rate.** For Value Received, the undersigned, Classic Properties Ypsilanti, LLC, an Ohio limited liability company (the "Borrower"), promises to pay to the order of Republic Bank (the "Bank"), at the main Ann Arbor office of the Bank, the principal sum of Three Million Five Hundred Seventy-Five Thousand and 00/100 Dollars ($3,575,000.00), or such lesser amount as is indicated on the Bank's records, with interest computed on the balance from time to time unpaid on the basis of the actual number of days elapsed in a year of 360 days at the rate (the "Note Rate") of six and thirteen one hundredths percent (6.13%) per year until the first Adjustment Date, and on the first and each subsequent Adjustment Date, the Note Rate will be adjusted to equal the Index in effect for such Adjustment Date plus two and seventy one hundredths (2.70) percentage points. For any Adjustment Date, the "Index" means the London Inter Bank Offered Rate (One Month) as reported by any source chosen by the Bank on such date. "Adjustment Date" means the first business day in each month following the date of this Note. In the event the London Inter Bank Offered Rate (One Month) ceases to be reported and is otherwise not readily determinable, the Index will mean a published rate chosen by the Bank comparable to the London Inter Bank Offered Rate (One Month). In no event will the interest rate exceed the maximum rate allowed by law. Any interest which would for any reason be unlawful under applicable law will be applied to principal.

**Interest Payments and Interest Reserve.** Interest that accrues under this Note will be paid in consecutive monthly installments commencing August 29, 2005 and continuing on the 29th day (the last day of February) of each consecutive month thereafter until July 29, 2008, at which time the entire balance of unpaid principal and interest is due and payable immediately. Two Hundred Eight Thousand Dollars ($208,000) of the proceeds of this Note must be used to fund an interest reserve for the payment of interest under this Note.

**Principal Payments and Prepayments.** The proceeds of this Development Loan Note are being used by the Borrower for the development of Phase I of a real estate development project located in the vicinity of Ellsworth Road, Hewitt Road, Michigan Avenue (U.S. 12), and I-94 in Ypsilanti Township, Washtenaw County, Michigan (the "Phase I Land"). During the term of this Development Loan Note, the Borrower is also borrowing from the Bank under a revolving builder line of credit for the construction of residential condominium units on the Phase I Land. When the Borrower borrows under the builder line of credit for the start of a condominium unit, the outstanding principal balance of this Development Loan Note will be reduced by $59,600.00, and the same amount, $59,600.00, will be drawn down on a sub-note under the builder line of credit (a "Sub-Note"). Regardless of the pace of construction

and sale of condominium units, the entire balance of this Development Loan Note must be paid in full by the due date, July 29, 2008. The Development Loan Note may be prepaid at any time, in whole or in part, without a prepayment premium.

**Takedown Schedule.** Beginning in the second calendar quarter of 2006 and continuing in each consecutive calendar quarter thereafter, the principal balance of this Note must be reduced by at least $476,800 (the dollar amount that equates to the establishment of at least eight (8) Sub-Notes). All Note principal reductions that are made before the first required reduction will count toward the first required reduction. In general, if the Note principal reduction in a quarter exceeds the minimum required reduction in that quarter, the excess may be counted toward the required reduction in the following quarter (or quarters, as the case may be). In other words, the principal reduction requirements under this Note will be satisfied if, at the end of any quarter, the average principal reduction per quarter equates to at least $476,800.

**Late Charge.** The Bank may charge a late charge equal to five percent (5%) of each installment which is received by the Bank more than ten (10) days after its due date. Acceptance of the late charge does not waive any default under this Note.

**Miscellaneous.** The Borrower and each endorser of this Note, and any other party liable for the debt evidenced by this Note, severally waives demand, presentment, notice of dishonor and protest of this Note; and consents to any extension or postponement of time of its payment without limit as to number or period; to any substitution, exchange or release of all or any part of the collateral securing this Note; to the addition of any party; and to the release, discharge, or suspension of any rights and remedies against any person who may be liable for the payment of the debt evidenced by this Note. No delay on the part of the holder in the exercise of any right or remedy will operate as a waiver; no single or partial exercise by the holder of any right or remedy will preclude any other or further exercise of that right or remedy or the exercise of any other right or remedy; and no waiver or indulgence by the holder of any default is effective unless it is in writing and signed by the holder; nor will a waiver on one occasion be construed as a bar to, or waiver of, any right on any future occasion.

**Development Loan Agreement.** This Note evidences a debt under the terms of a Development Loan Agreement between the Borrower and the Bank of even date, and any amendments to that agreement (collectively, the "Agreement"), the terms of which are incorporated into this Note by this reference, including events of default, remedies, notice, opportunity to cure, and acceleration provisions. This is the Development Loan Note referred to in the Agreement.

**Successors and Michigan Law.** This Note is binding on the Borrower and its successors, and inures to the benefit of the Bank, its successors and assigns. Any reference to the Bank includes any holder of this Note. This Note is delivered in the State of Michigan and governed by Michigan law.

2

**Waiver of Jury Trial.** The Bank and the Borrower, after consulting or having had the opportunity to consult with counsel, knowingly, voluntarily and intentionally waive any right either of them may have to a trial by jury in any litigation based upon or arising out of this Note or any related instrument or agreement or any of the transactions contemplated by this Note or any course of conduct, dealing, statements, whether oral or written, or actions of either of them. Neither the Bank nor the Borrower shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial has been waived with any other action in which a jury trial cannot be or has not been waived. These provisions shall not be deemed to have been modified in any respect or relinquished by either the Bank or the Borrower except by a written instrument executed by both of them.

**Loan Fees.** In connection with the Development Loan evidenced by this Development Loan Note, the Borrower has paid to the Bank a nonrefundable commitment fee in the amount of $17,875 and a nonrefundable documentation fee in the amount of $500.

BORROWER:

CLASSIC PROPERTIES YPSILANTI, LLC,
an Ohio limited liability company

Thomas H. Mallory, Jr., President of Classic
Traditions, LLC, an Ohio limited liability
company, the manager of Classic Properties
Ypsilanti, LLC

Republic Bank
Classic Properties Ypsilanti, LLC
Development Loan Note
July 29, 2005

LANSING 21461-251 361263v2

3



## CONTINUING UNLIMITED GUARANTY
(Thomas H. Mallory, Jr. for Taylor Classic Living, LLC)

1.    Promise to Pay.  For value received, Thomas H. Mallory, Jr. (the "Guarantor") hereby unconditionally guarantees to Republic Bank, a Michigan banking corporation (the "Bank"), the full and prompt payment or performance of the following in accordance with the terms of this Guaranty:  any and all indebtedness, obligations, promises, debts and liabilities of every kind and nature of Taylor Classic Living, LLC, an Ohio limited liability company (the "Borrower"), to the Bank (including, but not limited to, liabilities of any partnerships created or arising while the Borrower may have been a member thereof) however evidenced, whether now existing or hereafter created or arising, whether direct or indirect, absolute or contingent, joint or several and however owned, held or acquired by the Bank, whether through discount, overdraft, purchase, direct loan or as collateral or otherwise (hereinafter collectively the "Indebtedness"). The Guarantor also agrees to pay all costs and expenses including, but not limited to, reasonable attorney's fees incurred by the Bank in endeavoring to collect the Indebtedness or any part thereof and in enforcing this Guaranty or realizing upon any collateral for the Indebtedness or this Guaranty (including participating or taking action in any bankruptcy or other insolvency proceeding of the Borrower or the Guarantor). The amount of the Indebtedness, costs and expenses that is subject to this Continuing Guaranty is **not limited**.

2.    Extent of Liability.  If the Borrower fails to pay all or any part of the Indebtedness when due, whether by default or maturity, the Guarantor immediately upon the demand of the Bank will pay to the Bank the amount due and unpaid by the Borrower as if such amount constituted the direct and primary obligation of the Guarantor.  The Bank is not required prior to any such demand on or payment by the Guarantor to make any demand upon or pursue or exhaust any of its rights or remedies against the Borrower or any other person obligated with respect to the Indebtedness ("Obligor") or to pursue or exhaust any of its rights or remedies with respect to any collateral for the Indebtedness or this Guaranty.  Upon the death, incompetency, dissolution, liquidation or insolvency (however evidenced) of the Borrower, or the institution of bankruptcy or receivership proceedings against or by the Borrower, all of the Indebtedness then existing is, at the option of the Bank and without notice to the Borrower or the Guarantor, immediately due and payable by the Guarantor.  The Bank may enforce this Guaranty against the Guarantor without any obligation to resort to the Borrower for the payment or to any other guarantor or any collateral, security, liens or other rights or remedies of the Bank.

The Guarantor agrees to pay the Indebtedness to the Bank in accordance with the terms of each instrument and document evidencing the Indebtedness regardless of whether such terms are held to be unenforceable, void or of no effect against the Borrower or any other Obligor. Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against the Bank any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of

frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability that may be available to the Borrower or any other Obligor, or any setoff available to the Borrower or any other Obligor against the Bank, whether or not on account of a related transaction. The Guarantor is liable for any deficiency remaining after foreclosure of or realization upon any security for all or part of the Indebtedness, whether or not the liability of the Borrower or any other Obligor for the deficiency is discharged pursuant to statute, judicial decision or otherwise. If any payment applied by the Bank to the Indebtedness is subsequently set aside, recovered, rescinded or otherwise required to be returned or disgorged by the Bank for any reason (pursuant to bankruptcy proceedings, fraudulent conveyance statutes, or otherwise), the Indebtedness to which the payment was applied will for the purposes of this Guaranty be deemed to have continued in existence, notwithstanding the application, and this Guaranty is enforceable as to such Indebtedness as fully as if the Bank had not received and applied the payment.

       3.     Waivers and Powers of the Bank. The Guarantor waives: (i) any notice of the Borrower incurring any of the Indebtedness; (ii) presentment, demand, protest or notice of dishonor, nonpayment or other default with respect to any of the Indebtedness or any collateral therefore; and (iii) any rights of subrogation, reimbursement, contribution, indemnification, or other recourse against the Borrower arising out of payment of this Guaranty or any claim asserted against the Guarantor by reason of this Guaranty. The Guarantor hereby grants to the Bank full power in its discretion and without notice to the Guarantor to deal in any manner with the Indebtedness and any guarantor or any collateral, including but not limited to the following powers:

       A.     To change any terms of any of the Indebtedness, including the rate of interest and to grant any extension or renewal of the Indebtedness and any other indulgence with respect thereto and to effect any release, compromise or settlement of the Indebtedness;

       B.     To forebear or enter into any agreement to forebear from taking any action with respect to any of the Indebtedness or with respect to any guarantor or any collateral and to change the terms of any agreement to forebear;

       C.     To forebear for calling for additional collateral to secure any of the Indebtedness or any other obligation of the Borrower to the Bank;

       D.     To consent to the substitution, exchange or release of any one of the Guarantor (if more than one) and any other guarantors or all or any part of any collateral securing the Indebtedness whether or not any new collateral or guaranties, if any, received by the Bank as a result of any such substitution, exchange or release, are of the same or of a different character or value than the collateral or guarantees surrendered by the Bank; and

       E.     If the Indebtedness is not paid when due, whether by default, demand or maturity or if there is a default in the performance of any obligation with

respect to the collateral, to realize on all or part of the collateral as a whole or in such parcels or subdivided interest as the Bank may elect at any public or private sales for cash or on credit for future delivery without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the Guarantor hereby waives any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise or to forebear from realizing thereon as the Bank, in its discretion, deems proper and to purchase all or any part of any collateral for its own account at any such sale or foreclosure.

The obligations of the Guarantor hereunder are not released, discharged or in any way affected nor does the Guarantor have any rights or recourse against the Bank by reason of any action the Bank may take or omit to take under the foregoing powers.

The obligations of the Guarantor hereunder are not released, discharged or in any way affected by reason of the fact that a valid lien on any of the collateral may not be conveyed to or created in favor of the Bank; nor by reason of the fact that any of the collateral may be subject to equities or defenses or claims in favor of others or may be invalid or defective in any way;  nor by reason of the fact that any of the Indebtedness may be invalid or unenforceable for any reason; nor by reason of the fact that the value of any of the collateral or the financial condition of the Borrower, any obligor or any guarantor may not have been correctly estimated or may have changed or may hereafter change; nor by reason of any deterioration, waste or loss by fire, theft or otherwise of any collateral unless caused by the willful act or willful failure to act of the Bank;  nor by any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

No release or discharge of any one or more of the Guarantor or modification of this Guaranty as to any of the Guarantor (if there be more than one) shall release or discharge any other of the Guarantor unless and until all of the Indebtedness shall have been fully paid.

4.    Payments on the Indebtedness. All payments received from the Borrower or on account of the Indebtedness from any other source shall be taken and applied as payment in gross and this Guaranty applies to and secures any ultimate balance which remains owing to the Bank.  The Bank has the exclusive right to determine how, when and what application of payments and credits, if any, are made on the Indebtedness.

5.    Term of Guaranty. This Guaranty is a continuing, absolute and unconditional guaranty and remains in full force and effect until written notice of its discontinuance is actually received by the Bank and until any and all of the Indebtedness existing before receipt of such notice is fully paid.  The death, dissolution or withdrawal of any one or more of the Guarantor (if there be more than one) does not terminate this Guaranty until notice thereof is actually received by the Bank and until all of the Indebtedness existing before receipt of such notice is fully paid; and any such

3

notice or event does not limit or terminate the continuing obligations and liabilities of the heirs, successors and assigns of any of the Guarantor.

6.    Security. The liability of the Guarantor under this Guaranty is secured by all items now or hereafter deposited in any account of any of the Guarantor with the Bank and by all proceeds of such items (cash or otherwise); by all account balances of any of the Guarantor now or hereafter with the Bank; by all property of any of the Guarantor now or hereafter in the possession of the Bank; and by any other collateral, rights and properties described in each and every mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been or will hereafter be executed by any of the Guarantor to or for the benefit of the Bank (all herein collectively called the "Guaranty Collateral"). Any Guaranty Collateral or the proceeds thereof may be applied to satisfy the liability of the Guarantor under this Guaranty.

7.    Miscellaneous. The obligations of the Guarantor are joint and several; each of the Guarantor is individually liable for all amounts due hereunder. All persons signing this Guaranty on behalf of a corporation, partnership, trust or other entity warrant to the Bank that they are duly and properly authorized to execute this Guaranty. Nothing in this Guaranty waives or restricts any right of the Bank granted in any other document or by law. No delay on the part of the Bank in the exercise of any right or remedy operates as a waiver. No single or partial release by the Bank of any right or remedy precludes any other future exercise of that right or remedy or the exercise of any other right or remedy. No waiver or indulgence by the Bank of any default is effective unless in writing and signed by the Bank. Nor shall a waiver on one occasion be construed as a bar to or waiver of that right on any future occasion. Any reference to the Bank includes any assignee or holder of all or any part of the Indebtedness. Each and every immediate and successive assignee, transferee or holder of all or any part of the Indebtedness has the right to enforce this Guaranty by suit or otherwise for the benefit of such assignee, transferee or holder as fully as if such assignee, transferee or holder were specifically named herein, provided that the Bank has an unimpaired right to enforce this Guaranty for its benefit as to so much of the Indebtedness as it has not assigned or transferred. This Guaranty binds the respective heirs, personal representatives, successors and assigns of the Guarantor. This Guaranty was executed in Michigan and is governed by Michigan law. Any married woman executing this Guaranty acknowledges that she binds and intends to bind her individual estate hereby.

8.    WAIVER OF JURY TRIAL. THE GUARANTOR AND THE BANK EACH HEREBY KNOWINGLY AND VOLUNTARILY, WITHOUT COERCION AND AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM ARISING OUT OF THIS GUARANTY, ANY OF THE LIABILITIES, OR ANY ALLEGED ACT OR NEGLECT OF THE BANK. NEITHER THE GUARANTOR NOR THE BANK WILL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS

4

BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE
OR HAS NOT BEEN WAIVED.  THIS WAIVER OF JURY TRIAL MAY NOT BE
MODIFIED IN ANY RESPECT OR RELINQUISHED BY ANY PARTY EXCEPT IN A
WRITTEN INSTRUMENT EXECUTED BY ALL PARTIES.

     9.   <u>Financial Information</u>.  The Guarantor will furnish to the Bank the
following:

     A.   Annually, at a time prescribed by the Bank, the Guarantor will
provide his then-current annual personal signed financial statement to the Bank, in a
format, or on a form, acceptable to the Bank.

     B.   Annually, within ten days after its filing date, the Guarantor will
provide a signed copy of his then-current annual federal income tax return to the Bank,
complete with all attachments and schedules.

     B.   Promptly upon request by the Bank, any additional financial or
other information regarding the Guarantor as the Bank may request.  Any information
will be in such form and detail as the Bank may specify.  *Reasonably nw*

Date of Signing:  July 15, 2004  *reasonally*

Guarantor:

_____
Thomas H. Mallory, Jr.

LANSING  21461-211  342202

5

## CONTINUING UNLIMITED GUARANTY
✓ (Thomas H. Mallory, Jr. for
Classic Traditions, LLC and Classic Properties Ypsilanti, LLC)

1.    _Promise to Pay_. For value received, Thomas H. Mallory, Jr. (the "Guarantor") hereby unconditionally guarantees to Republic Bank, a Michigan banking corporation (the "Bank"), the full and prompt payment or performance of the following in accordance with the terms of this Guaranty:  any and all indebtedness, obligations, promises, debts and liabilities of every kind and nature of Classic Traditions, LLC, an Ohio limited liability company, and/or Classic Properties Ypsilanti, LLC, an Ohio limited liability company (jointly and severally, the "Borrower"), to the Bank (including, but not limited to, liabilities of any partnerships created or arising while the Borrower may have been a member thereof) however evidenced, whether now existing or hereafter created or arising, whether direct or indirect, absolute or contingent, joint or several and however owned, held or acquired by the Bank, whether through discount, overdraft, purchase, direct loan or as collateral or otherwise (hereinafter collectively the "Indebtedness"). The Guarantor also agrees to pay all costs and expenses including, but not limited to, reasonable attorney's fees incurred by the Bank in endeavoring to collect the Indebtedness or any part thereof and in enforcing this Guaranty or realizing upon any collateral for the Indebtedness or this Guaranty (including participating or taking action in any bankruptcy or other insolvency proceeding of the Borrower or the Guarantor). The amount of the Indebtedness, costs and expenses that is subject to this Continuing Guaranty is _**not limited**_.

2.    _Extent of Liability_. If the Borrower fails to pay all or any part of the Indebtedness when due, whether by default or maturity, the Guarantor immediately upon the demand of the Bank will pay to the Bank the amount due and unpaid by the Borrower as if such amount constituted the direct and primary obligation of the Guarantor. The Bank is not required prior to any such demand on or payment by the Guarantor to make any demand upon or pursue or exhaust any of its rights or remedies against the Borrower or any other person obligated with respect to the Indebtedness ("Obligor") or to pursue or exhaust any of its rights or remedies with respect to any collateral for the Indebtedness or this Guaranty. Upon the death, incompetency, dissolution, liquidation or insolvency (however evidenced) of the Borrower, or the institution of bankruptcy or receivership proceedings against or by the Borrower, all of the Indebtedness then existing is, at the option of the Bank and without notice to the Borrower or the Guarantor, immediately due and payable by the Guarantor. The Bank may enforce this Guaranty against the Guarantor without any obligation to resort to the Borrower for the payment or to any other guarantor or any collateral, security, liens or other rights or remedies of the Bank.

The Guarantor agrees to pay the Indebtedness to the Bank in accordance with the terms of each instrument and document evidencing the Indebtedness regardless of whether such terms are held to be unenforceable, void or of no effect against the Borrower or any other Obligor. Without limiting the generality of the

foregoing, the Guarantor will not assert, plead or enforce against the Bank any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability that may be available to the Borrower or any other Obligor, or any setoff available to the Borrower or any other Obligor against the Bank, whether or not on account of a related transaction. The Guarantor is liable for any deficiency remaining after foreclosure of or realization upon any security for all or part of the Indebtedness, whether or not the liability of the Borrower or any other Obligor for the deficiency is discharged pursuant to statute, judicial decision or otherwise. If any payment applied by the Bank to the Indebtedness is subsequently set aside, recovered, rescinded or otherwise required to be returned or disgorged by the Bank for any reason (pursuant to bankruptcy proceedings, fraudulent conveyance statutes, or otherwise), the Indebtedness to which the payment was applied will for the purposes of this Guaranty be deemed to have continued in existence, notwithstanding the application, and this Guaranty is enforceable as to such Indebtedness as fully as if the Bank had not received and applied the payment.

3.    <u>Waivers and Powers of the Bank</u>.  The Guarantor waives:  (i) any notice of the Borrower incurring any of the Indebtedness; (ii) presentment, demand, protest or notice of dishonor, nonpayment or other default with respect to any of the Indebtedness or any collateral therefore; and (iii) any rights of subrogation, reimbursement, contribution, indemnification, or other recourse against the Borrower arising out of payment of this Guaranty or any claim asserted against the Guarantor by reason of this Guaranty.  The Guarantor hereby grants to the Bank full power in its discretion and without notice to the Guarantor to deal in any manner with the Indebtedness and any guarantor or any collateral, including but not limited to the following powers:

A.    To change any terms of any of the Indebtedness, including the rate of interest and to grant any extension or renewal of the Indebtedness and any other indulgence with respect thereto and to effect any release, compromise or settlement of the Indebtedness;

B.    To forebear or enter into any agreement to forebear from taking any action with respect to any of the Indebtedness or with respect to any guarantor or any collateral and to change the terms of any agreement to forebear;

C.    To forebear for calling for additional collateral to secure any of the Indebtedness or any other obligation of the Borrower to the Bank;

D.    To consent to the substitution, exchange or release of any one of the Guarantor (if more than one) and any other guarantors or all or any part of any collateral securing the Indebtedness whether or not any new collateral or guaranties, if any, received by the Bank as a result of any such substitution, exchange or release, are of the same or of a different character or value than the collateral or guarantees surrendered by the Bank; and

2

E.    If the Indebtedness is not paid when due, whether by default, demand or maturity or if there is a default in the performance of any obligation with respect to the collateral, to realize on all or part of the collateral as a whole or in such parcels or subdivided interest as the Bank may elect at any public or private sales for cash or on credit for future delivery without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the Guarantor hereby waives any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise or to forebear from realizing thereon as the Bank, in its discretion, deems proper and to purchase all or any part of any collateral for its own account at any such sale or foreclosure.

The obligations of the Guarantor hereunder are not released, discharged or in any way affected nor does the Guarantor have any rights or recourse against the Bank by reason of any action the Bank may take or omit to take under the foregoing powers.

The obligations of the Guarantor hereunder are not released, discharged or in any way affected by reason of the fact that a valid lien on any of the collateral may not be conveyed to or created in favor of the Bank; nor by reason of the fact that any of the collateral may be subject to equities or defenses or claims in favor of others or may be invalid or defective in any way; nor by reason of the fact that any of the Indebtedness may be invalid or unenforceable for any reason; nor by reason of the fact that the value of any of the collateral or the financial condition of the Borrower, any obligor or any guarantor may not have been correctly estimated or may have changed or may hereafter change; nor by reason of any deterioration, waste or loss by fire, theft or otherwise of any collateral unless caused by the willful act or willful failure to act of the Bank; nor by any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

No release or discharge of any one or more of the Guarantor or modification of this Guaranty as to any of the Guarantor (if there be more than one) shall release or discharge any other of the Guarantor unless and until all of the Indebtedness shall have been fully paid.

4.    Payments on the Indebtedness.  All payments received from the Borrower or on account of the Indebtedness from any other source shall be taken and applied as payment in gross and this Guaranty applies to and secures any ultimate balance which remains owing to the Bank.  The Bank has the exclusive right to determine how, when and what application of payments and credits, if any, are made on the Indebtedness.

5.    Term of Guaranty.  This Guaranty is a continuing, absolute and unconditional guaranty and remains in full force and effect until written notice of its discontinuance is actually received by the Bank and until any and all of the Indebtedness existing before receipt of such notice is fully paid.  The death, dissolution or withdrawal of any one or more of the Guarantor (if there be more than one) does not terminate this Guaranty until notice thereof is actually received by the Bank and until all

3

of the Indebtedness existing before receipt of such notice is fully paid; and any such notice or event does not limit or terminate the continuing obligations and liabilities of the heirs, successors and assigns of any of the Guarantor.

6.      Security.  The liability of the Guarantor under this Guaranty is secured by all items now or hereafter deposited in any account of any of the Guarantor with the Bank and by all proceeds of such items (cash or otherwise); by all account balances of any of the Guarantor now or hereafter with the Bank; by all property of any of the Guarantor now or hereafter in the possession of the Bank; and by any other collateral, rights and properties described in each and every mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been or will hereafter be executed by any of the Guarantor to or for the benefit of the Bank (all herein collectively called the "Guaranty Collateral").  Any Guaranty Collateral or the proceeds thereof may be applied to satisfy the liability of the Guarantor under this Guaranty.

7.      Miscellaneous.  The obligations of the Guarantor are joint and several; each of the Guarantor is individually liable for all amounts due hereunder.  All persons signing this Guaranty on behalf of a corporation, partnership, trust or other entity warrant to the Bank that they are duly and properly authorized to execute this Guaranty. Nothing in this Guaranty waives or restricts any right of the Bank granted in any other document or by law.  No delay on the part of the Bank in the exercise of any right or remedy operates as a waiver.  No single or partial release by the Bank of any right or remedy precludes any other future exercise of that right or remedy or the exercise of any other right or remedy.  No waiver or indulgence by the Bank of any default is effective unless in writing and signed by the Bank.  Nor shall a waiver on one occasion be construed as a bar to or waiver of that right on any future occasion.  Any reference to the Bank includes any assignee or holder of all or any part of the Indebtedness.  Each and every immediate and successive assignee, transferee or holder of all or any part of the Indebtedness has the right to enforce this Guaranty by suit or otherwise for the benefit of such assignee, transferee or holder as fully as if such assignee, transferee or holder were specifically named herein, provided that the Bank has an unimpaired right to enforce this Guaranty for its benefit as to so much of the Indebtedness as it has not assigned or transferred.  This Guaranty binds the respective heirs, personal representatives, successors and assigns of the Guarantor.  This Guaranty was executed in Michigan and is governed by Michigan law.  Any married woman executing this Guaranty acknowledges that she binds and intends to bind her individual estate hereby.

8.      WAIVER OF JURY TRIAL.  THE GUARANTOR AND THE BANK EACH HEREBY KNOWINGLY AND VOLUNTARILY, WITHOUT COERCION AND AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM ARISING OUT OF THIS GUARANTY, ANY OF THE LIABILITIES, OR ANY ALLEGED ACT OR NEGLECT OF THE BANK.  NEITHER THE GUARANTOR NOR THE BANK WILL SEEK TO CONSOLIDATE, BY

4

COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.  THIS WAIVER OF JURY TRIAL MAY NOT BE MODIFIED IN ANY RESPECT OR RELINQUISHED BY ANY PARTY EXCEPT IN A WRITTEN INSTRUMENT EXECUTED BY ALL PARTIES.

      9.     <u>Financial Information</u>.  The Guarantor will furnish to the Bank the following:

      A.     Annually, at a time prescribed by the Bank, the Guarantor will provide his then-current annual personal signed financial statement to the Bank, in a format, or on a form, acceptable to the Bank.

      B.     Annually, within ten days after its filing date, the Guarantor will provide a signed copy of his then-current annual federal income tax return to the Bank, complete with all attachments and schedules.

      C.     Promptly upon request by the Bank, any additional financial or other information regarding the Guarantor as the Bank may reasonably request.  Any information will be in such form and detail as the Bank may reasonably specify.

Dated:  July 29, 2005

                        Guarantor:

                        Thomas H. Mallory, Jr.



## CONTINUING UNLIMITED GUARANTY
(Kenneth F. Danter for Taylor Classic Living, LLC)

1.    Promise to Pay.  For value received, Kenneth F. Danter (the "Guarantor") hereby unconditionally guarantees to Republic Bank, a Michigan banking corporation (the "Bank"), the full and prompt payment or performance of the following in accordance with the terms of this Guaranty:  any and all indebtedness, obligations, promises, debts and liabilities of every kind and nature of Taylor Classic Living, LLC, an Ohio limited liability company (the "Borrower"), to the Bank (including, but not limited to, liabilities of any partnerships created or arising while the Borrower may have been a member thereof) however evidenced, whether now existing or hereafter created or arising, whether direct or indirect, absolute or contingent, joint or several and however owned, held or acquired by the Bank, whether through discount, overdraft, purchase, direct loan or as collateral or otherwise (hereinafter collectively the "Indebtedness").  The Guarantor also agrees to pay all costs and expenses including, but not limited to, reasonable attorney's fees incurred by the Bank in endeavoring to collect the Indebtedness or any part thereof and in enforcing this Guaranty or realizing upon any collateral for the Indebtedness or this Guaranty (including participating or taking action in any bankruptcy or other insolvency proceeding of the Borrower or the Guarantor). The amount of the Indebtedness, costs and expenses that is subject to this Continuing Guaranty is **_not limited_**.

2.    Extent of Liability.  If the Borrower fails to pay all or any part of the Indebtedness when due, whether by default or maturity, the Guarantor immediately upon the demand of the Bank will pay to the Bank the amount due and unpaid by the Borrower as if such amount constituted the direct and primary obligation of the Guarantor.  The Bank is not required prior to any such demand on or payment by the Guarantor to make any demand upon or pursue or exhaust any of its rights or remedies against the Borrower or any other person obligated with respect to the Indebtedness ("Obligor") or to pursue or exhaust any of its rights or remedies with respect to any collateral for the Indebtedness or this Guaranty.  Upon the death, incompetency, dissolution, liquidation or insolvency (however evidenced) of the Borrower, or the institution of bankruptcy or receivership proceedings against or by the Borrower, all of the Indebtedness then existing is, at the option of the Bank and without notice to the Borrower or the Guarantor, immediately due and payable by the Guarantor.  The Bank may enforce this Guaranty against the Guarantor without any obligation to resort to the Borrower for the payment or to any other guarantor or any collateral, security, liens or other rights or remedies of the Bank.

The Guarantor agrees to pay the Indebtedness to the Bank in accordance with the terms of each instrument and document evidencing the Indebtedness regardless of whether such terms are held to be unenforceable, void or of no effect against the Borrower or any other Obligor.  Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against the Bank any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of

frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability that may be available to the Borrower or any other Obligor, or any setoff available to the Borrower or any other Obligor against the Bank, whether or not on account of a related transaction. The Guarantor is liable for any deficiency remaining after foreclosure of or realization upon any security for all or part of the Indebtedness, whether or not the liability of the Borrower or any other Obligor for the deficiency is discharged pursuant to statute, judicial decision or otherwise. If any payment applied by the Bank to the Indebtedness is subsequently set aside, recovered, rescinded or otherwise required to be returned or disgorged by the Bank for any reason (pursuant to bankruptcy proceedings, fraudulent conveyance statutes, or otherwise), the Indebtedness to which the payment was applied will for the purposes of this Guaranty be deemed to have continued in existence, notwithstanding the application, and this Guaranty is enforceable as to such Indebtedness as fully as if the Bank had not received and applied the payment.

3.    Waivers and Powers of the Bank.  The Guarantor waives:  (i) any notice of the Borrower incurring any of the Indebtedness; (ii) presentment, demand, protest or notice of dishonor, nonpayment or other default with respect to any of the Indebtedness or any collateral therefore; and (iii) any rights of subrogation, reimbursement, contribution, indemnification, or other recourse against the Borrower arising out of payment of this Guaranty or any claim asserted against the Guarantor by reason of this Guaranty. The Guarantor hereby grants to the Bank full power in its discretion and without notice to the Guarantor to deal in any manner with the Indebtedness and any guarantor or any collateral, including but not limited to the following powers:

A.    To change any terms of any of the Indebtedness, including the rate of interest and to grant any extension or renewal of the Indebtedness and any other indulgence with respect thereto and to effect any release, compromise or settlement of the Indebtedness;

B.    To forebear or enter into any agreement to forebear from taking any action with respect to any of the Indebtedness or with respect to any guarantor or any collateral and to change the terms of any agreement to forebear;

C.    To forebear for calling for additional collateral to secure any of the Indebtedness or any other obligation of the Borrower to the Bank;

D.    To consent to the substitution, exchange or release of any one of the Guarantor (if more than one) and any other guarantors or all or any part of any collateral securing the Indebtedness whether or not any new collateral or guaranties, if any, received by the Bank as a result of any such substitution, exchange or release, are of the same or of a different character or value than the collateral or guarantees surrendered by the Bank; and

E.    If the Indebtedness is not paid when due, whether by default, demand or maturity or if there is a default in the performance of any obligation with

2

respect to the collateral, to realize on all or part of the collateral as a whole or in such parcels or subdivided interest as the Bank may elect at any public or private sales for cash or on credit for future delivery without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the Guarantor hereby waives any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise or to forebear from realizing thereon as the Bank, in its discretion, deems proper and to purchase all or any part of any collateral for its own account at any such sale or foreclosure.

The obligations of the Guarantor hereunder are not released, discharged or in any way affected nor does the Guarantor have any rights or recourse against the Bank by reason of any action the Bank may take or omit to take under the foregoing powers.

The obligations of the Guarantor hereunder are not released, discharged or in any way affected by reason of the fact that a valid lien on any of the collateral may not be conveyed to or created in favor of the Bank; nor by reason of the fact that any of the collateral may be subject to equities or defenses or claims in favor of others or may be invalid or defective in any way; nor by reason of the fact that any of the Indebtedness may be invalid or unenforceable for any reason; nor by reason of the fact that the value of any of the collateral or the financial condition of the Borrower, any obligor or any guarantor may not have been correctly estimated or may have changed or may hereafter change; nor by reason of any deterioration, waste or loss by fire, theft or otherwise of any collateral unless caused by the willful act or willful failure to act of the Bank; nor by any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

No release or discharge of any one or more of the Guarantor or modification of this Guaranty as to any of the Guarantor (if there be more than one) shall release or discharge any other of the Guarantor unless and until all of the Indebtedness shall have been fully paid.

4.    Payments on the Indebtedness.  All payments received from the Borrower or on account of the Indebtedness from any other source shall be taken and applied as payment in gross and this Guaranty applies to and secures any ultimate balance which remains owing to the Bank.  The Bank has the exclusive right to determine how, when and what application of payments and credits, if any, are made on the Indebtedness.

5.    Term of Guaranty.  This Guaranty is a continuing, absolute and unconditional guaranty and remains in full force and effect until written notice of its discontinuance is actually received by the Bank and until any and all of the Indebtedness existing before receipt of such notice is fully paid.  The death, dissolution or withdrawal of any one or more of the Guarantor (if there be more than one) does not terminate this Guaranty until notice thereof is actually received by the Bank and until all of the Indebtedness existing before receipt of such notice is fully paid; and any such

3

notice or event does not limit or terminate the continuing obligations and liabilities of the heirs, successors and assigns of any of the Guarantor.

6.    Security.  The liability of the Guarantor under this Guaranty is secured by all items now or hereafter deposited in any account of any of the Guarantor with the Bank and by all proceeds of such items (cash or otherwise); by all account balances of any of the Guarantor now or hereafter with the Bank; by all property of any of the Guarantor now or hereafter in the possession of the Bank; and by any other collateral, rights and properties described in each and every mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been or will hereafter be executed by any of the Guarantor to or for the benefit of the Bank (all herein collectively called the "Guaranty Collateral").  Any Guaranty Collateral or the proceeds thereof may be applied to satisfy the liability of the Guarantor under this Guaranty.

7.    Miscellaneous.  The obligations of the Guarantor are joint and several; each of the Guarantor is individually liable for all amounts due hereunder.  All persons signing this Guaranty on behalf of a corporation, partnership, trust or other entity warrant to the Bank that they are duly and properly authorized to execute this Guaranty. Nothing in this Guaranty waives or restricts any right of the Bank granted in any other document or by law.  No delay on the part of the Bank in the exercise of any right or remedy operates as a waiver.  No single or partial release by the Bank of any right or remedy precludes any other future exercise of that right or remedy or the exercise of any other right or remedy.  No waiver or indulgence by the Bank of any default is effective unless in writing and signed by the Bank.  Nor shall a waiver on one occasion be construed as a bar to or waiver of that right on any future occasion.  Any reference to the Bank includes any assignee or holder of all or any part of the Indebtedness.  Each and every immediate and successive assignee, transferee or holder of all or any part of the Indebtedness has the right to enforce this Guaranty by suit or otherwise for the benefit of such assignee, transferee or holder as fully as if such assignee, transferee or holder were specifically named herein, provided that the Bank has an unimpaired right to enforce this Guaranty for its benefit as to so much of the Indebtedness as it has not assigned or transferred.  This Guaranty binds the respective heirs, personal representatives, successors and assigns of the Guarantor.  This Guaranty was executed in Michigan and is governed by Michigan law.  Any married woman executing this Guaranty acknowledges that she binds and intends to bind her individual estate hereby.

8.    WAIVER OF JURY TRIAL.  THE GUARANTOR AND THE BANK EACH HEREBY KNOWINGLY AND VOLUNTARILY, WITHOUT COERCION AND AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM ARISING OUT OF THIS GUARANTY, ANY OF THE LIABILITIES, OR ANY ALLEGED ACT OR NEGLECT OF THE BANK.  NEITHER THE GUARANTOR NOR THE BANK WILL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS

4

BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THIS WAIVER OF JURY TRIAL MAY NOT BE MODIFIED IN ANY RESPECT OR RELINQUISHED BY ANY PARTY EXCEPT IN A WRITTEN INSTRUMENT EXECUTED BY ALL PARTIES.

9.    Financial Information. The Guarantor will furnish to the Bank the following:

A.    Annually, at a time prescribed by the Bank, the Guarantor will provide his then-current annual personal signed financial statement to the Bank, in a format, or on a form, acceptable to the Bank.

B.    Annually, within ten days after its filing date, the Guarantor will provide a signed copy of his then-current annual federal income tax return to the Bank, complete with all attachments and schedules.

B.    Promptly upon request by the Bank, any additional financial or other information regarding the Guarantor as the Bank may request. Any information will be in such form and detail as the Bank may specify.    reasonably MW

Date of Signing: July 15, 2004

Guarantor:

_____
Kenneth F. Danter